United States District Court
Southern District of Texas
**ENTERED**
December 27, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| RALPHEAL WHITE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-20-4029 |
| | § | |
| BARRY CALVERT and NATHANIEL BROWN, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Ralpheal White fled from Baytown Police Department officers after the vehicle he was driving was pulled over for a minor traffic infraction and because of a citizen report of a possible drug transaction involving someone in a similar vehicle. White got out of his car and ran. The police chased White for over two hours in the middle of the night, as White ran across a major highway and over a 10-foot razor wire fence. The police eventually found White attempting to hide in a residential backyard. At Officer Nathaniel Brown's request, Officer Barry Calvert released his police dog to capture and hold White in a small shed in the backyard. White alleges that immediately before Officer Calvert released the dog, Officer Brown saw White lying on the ground of the shed, on his stomach, with his hands visible behind his back, no longer attempting to resist or evade arrest. The dog bit White for about 90 seconds, despite efforts by Officer Calvert to get the dog to release his bite sooner.

White alleges that Officer Calvert used excessive force, in violation of the Fourth Amendment, by subjecting White to a lengthy and cruel dog attack that inflicted serious injuries, even though he had no reason to believe that White then posed a threat of either flight or to officer

safety.  White alleges that Officer Brown violated the Fourth Amendment by failing to intervene to prevent Officer Calvert from using excessive force.  White brings these claims under 42 U.S.C. § 1983.  Officers Calvert and Brown moved for summary judgment on the basis that they are immune from suit.  The evidence includes bodycam and other video recordings that present an incomplete but jarring record of the encounter.  Based on the motion, the responses, the record, and the applicable law, the court grants the motion for summary judgment as to Officer Brown and denies the motion for summary judgment as to Officer Calvert because there are factual disputes material to determining qualified immunity as to Calvert that preclude resolution at this stage.

The reasons for these rulings are set out below.

## I.    Background

On the night of January 25, 2019, Brown was on duty as a Baytown police officer.  (Docket Entry No. 17-1, at 2).  Brown followed White's car after receiving a citizen report of a suspicious person, possibly involved in a drug offense, with a vehicle description matching White's car.  (*Id.*).  Brown saw White, the driver, make a turn without signaling.  (*Id.*).  White had already parked and exited his vehicle when Officer Brown flashed his emergency lights and ordered White to get back in his car.  (Docket Entry No. 17-2, at 14–15).

Rather than return to the car as ordered, White fled.  (Docket Entry No. 17-7).  White testified that he recognized Brown as an officer he had encountered before, and he feared that Brown would hurt him.  (Docket Entry No. 17-5, at 16) ("I ran from Brown, because I know he's hands on. . . . [H]e just likes to put his hands on me every time.  I cannot [sic] be doing nothing, and he'll put his hands on me.")).  Officer Brown testified that he and White "ha[d] a history," but

2

he did not recognize White that night until hours later, when White was eventually arrested. (Docket Entry No. 17-2, at 11–12).

Officer Brown chased White.  Brown alleges that he saw White "discarding items as he ran that [Officer Brown] suspected were likely drugs."  (Docket Entry No. 17-1, at 2; Docket Entry No. 17-2, at 15).  Brown called for backup after he lost sight of White.  (Docket Entry No. 17-1, at 3).  Officer Calvert responded to the backup call.  Calvert reported that "Brown said he had one running from him and that [the man] was reaching into his waistband."  (Docket Entry No. 17-4, at 12).  Officer Calvert was teamed with a K-9 patrol dog named Hero.  (Docket Entry No. 17-3, at 2).

For the next two and a half hours, officers pursued White.  (Docket Entry No. 17-4, at 13).  White, who was running without shoes, managed to run across a major highway and jump over a 10-foot razor wire fence.  (Docket Entry No. 17-1, at 3; Docket Entry No. 17-3, at 2; Docket Entry No. 17-4, at 14).  Eventually, the officers found White hiding in the backyard of a residence.  (Docket Entry No. 17-1, at 3).  The officers got the homeowner's permission to search his property, (*Id.*, Docket Entry No. 17-3, at 3), and proceeded to search a greenhouse tent in the backyard.  (Docket Entry No. 17-3, at 4).  Officer Calvert "released K-9 Hero from his leash to search the greenhouse," because "[i]n these circumstances, it was appropriate to deploy a K-9 to search inside the greenhouse to protect officers, the safety of others in the area including residents, and to find and arrest White."  (Docket Entry No. 17-3, at 4).

The parties disagree as to what happened at this point.  Calvert stated that "[he] heard K-9 Hero run to the back of the greenhouse pursuing White after White ran out of the back of the greenhouse toward officers."  (Docket Entry No. 17-3, at 4).  Brown stated that he "heard White

3

running and when [he] turned toward the sound of him running, [he] saw White running directly [at him].  To protect [his] safety, the safety of other officers, and to detain White, [he] deployed [his] department issued taser cartridge toward White striking the front of his body."  (Docket Entry No. 17-1, at 3; *see also* Docket Entry No. 17-2, at 19 ("I turned around and saw him running directly at me, and that's when I deployed my TASER and attempted to apprehend him.")).  Brown and Calvert both stated that the taser had little impact, because "only one of the taser probes contacted White."  (Docket Entry No. 17-3, at 4; *see also* Docket Entry No. 17-1, at 3, 4; Docket Entry No. 17-2, at 19–20).  White ran from the greenhouse tent into an unlit storage shed in the backyard, where he was effectively trapped.  At this point, only Officer Brown could see White.  Brown stated that, "[f]rom outside the shed, I looked inside and with some light from my flashlight I could determine White was on the floor.  But I could not determine if White was armed, so I issued commands for [White] to show me his hands but White refused to reveal his hands."  (Docket Entry No. 17-1, at 3–4).  Brown "perceived White to move a hand toward his waistline, so [he] immediately called for a dog to assist [him]," (*id.* at 4), by calling out "Dog, dog, dog.  He's reaching.  Dog, dog, dog."  (Docket Entry No. 17-2, at 23).

Officer Calvert ordered K-9 Hero to enter the shed to attack White.  (Docket Entry No. 17-3, at 4; Docket Entry No. 17-4, at 41).  "A short time" after Hero entered the shed, Officer Calvert "arrived near the door of the shed and . . . observed White strike K-9 Hero as Hero grasped White's upper arm."  (Docket Entry No. 17-3, at 4).  "As soon as [Calvert] was able to visually confirm that White was not holding a weapon, [he] entered the shed and got into place behind Hero in a position from which [he] could exert physical control of Hero if necessary."  (*Id.*, at 4).  Officer Calvert gave Hero the command to release his bite, but Hero's "teeth were entangled in White's

4

jacket." (*Id.*, at 5; Docket Entry No. 17-4, at 33 ("He did release and then he was caught on the clothing, which causes him to think that the subject is still resisting; so he was hanging on to the clothing.")).   Officer Calvert stated that, "[w]hen I saw that Hero had not released his grasp of White's jacket, I immediately gave five successive verbal commands to Hero to release his bite," and "also took the actions necessary to physically remove Hero by controlling his head, holding on to his collar, and using the leash to restrict Hero's air flow which caused Hero to disengage from White and his jacket." (Docket Entry No. 17-3, at 5).  Once the dog released its grip, officers removed White from the shed and placed him in handcuffs.  (*Id.*).  The difficulty in getting the dog to disengage prolonged and worsened the bite attack.

White recounts the events differently.  In his deposition, White testified that he was in the backyard after exiting the greenhouse tent when Officer Brown tased him.  (Docket Entry No. 17-5, at 48–49).  White testified that the taser did hit him and caused him to fall into a shed in the yard on his stomach.  (*Id.*, at 49, 58).  He testified that, "before the dog came into the shed I'd already put both of my hands behind my back," and told Officer Brown to "cuff [him]," because he didn't "want[] them to put the dog on me."  (*Id.*, at 60, 62–63; *see also id.* at 81 ("I was talking to Officer Brown, and I had my hand—well, the first thing I did was put my hands behind my back.  Then I started talking to Officer Brown, asking him please don't release the dog on me.  I've got my hands behind my back.")).  Officer Brown saw White's hands, saw no weapon, and saw that he was no longer trying to flee.  Brown nonetheless called for the dog.  White testified that Officer Calvert "was holding" the dog by his collar, and that when released, the dog "bit [him] from behind on [his] arm behind [his] back."  (*Id.*, at 65–66).  According to White, "the officer let [the dog] bite on me for a little bit, and [then Officer Calvert] pulled him off of me, and then he released him

again on me."  (*Id.*; *see also id.* at 71 ("He pulled the dog off of me.  And he told me to stop resisting arrest, and I wasn't resisting.  And then he put the dog back on me.")).  However, when asked how he knew that Officer Calvert "put the dog back on [him], instead of the dog . . . acting on its own," White replied, "I don't know."  (Docket Entry No. 19-1, at 272; *see also id.* at 272–73 (Q: "[D]id you hear the—the dog handler say anything between the first time the dog bit you and the second time the dog bit you?"  A: "I heard him, but I can't recall no command.  I heard him talking.")).

In addition to affidavits and deposition testimony from White, Brown, and Calvert, there is some body camera footage.  The body camera footage is from body cameras worn by other officers at the scene.  Both Brown and Calvert stated that they were wearing their body cameras, but that the cameras weren't recording.  (Docket Entry No. 17-2, at 7; Docket Entry No. 17-4, at 5 ("Mine shut off. . . .  It was faulty equipment.  They since changed the design in the body cam.")).

Footage from the first body camera shows Hero released and entering the shed.  (Docket Entry No. 17-8).  For the next 15 seconds, the camera view is completely blocked by the backs of several officers standing outside the shed.  The recording then shows Hero biting White and holding White's right arm in his jaws.  About 20 seconds after Hero entered the shed, Officer Calvert walks behind the dog, grabs his leash, and pulls back on the leash.  There is no audio in the recording for the first 30 seconds.  White can be heard screaming for the next 13 seconds of the recording.  The footage at this time is mostly blocked by officers' backs, but the 59 second mark briefly shows Hero's jaws still clenched around either White's arm or his sweatshirt.  Approximately 49 seconds after Hero entered the shed, Calvert repeatedly shouts, "Ereszd," a Hungarian word that the dog had been trained to recognize as the command to release its grip.

6

Calvert can also be heard shouting, "suspect, stop fighting my dog."  The dog starts barking 1 minute and 19 seconds into the recording, indicating that the dog has released its jaws from their grip on White's arm.  The officers pull White from the shed and handcuff him.

Footage from the second body camera shows officers arriving at the residence and asking the homeowners for permission to search the property.  (Docket Entry No. 17-9).  There is no sound until 39 seconds into the recording.  Officers start to search the backyard, and the officer whose body camera is filming goes to "stand in the corner" of the yard.  Three minutes and 48 seconds into the video, the officer starts running toward a commotion in the yard, but the footage is too blurry to make out.  At 4 minutes into the recording, Brown shouts, "Dog, dog, dog.  He's reaching.  Dog, dog, dog," and someone else shouts, "cut the dog."  At 4:06 minutes in, Hero runs into the shed and an officer shouts "get him."  Officer Calvert, not visible on the body camera footage, shouts, "stop fighting my dog," and Officer Calvert or another officer shout repeatedly, "Quit fighting the dog, quit fighting the dog."  White can be heard screaming.  Officer Calvert, still not visible on camera, shouts multiple times for Hero to "Ereszd," approximately 53 seconds after the dog entered the shed.  The footage does not show the interactions between Hero, White, and Calvert.  The officer wearing the body camera put his hand over the camera for about 35 seconds while Hero was in the shed.  It is unclear if the officer intentionally blocked the camera.

The parties retained experts on the use of a police dog in law enforcement.  The expert reports are not helpful to understand what happened.  Both experts describe the events differently from the parties' own, sometimes varying, descriptions.  The defendants' expert described the incident as follows:

> Officer Calvert deployed K-9 Hero to find and apprehend White inside the shed.
> K-9 Hero grasped the upper portion of White's right arm and White continued to

physically resist apprehension.  White struck K-9 Hero on his face.  Officer Brown told White to stop fighting and to put his hands behind his back.  When White complied, [O]fficer Calvert removed K-9 Hero from contact with White.  White was escorted from the shed by officers and even then he continued to resist by standing up when told to stay down and White pulled away from officers.  Officer Calvert gave commands to White to "stop resisting or the dog will bite again."  At that point, White stopped resisting detention and no further force was used.

(Docket Entry No. 17-6, at 7).

Neither the officers, nor White, testified that Calvert commanded White to "stop resisting or the dog will bite" as the officers led White out of the shed, with his hands behind his back.  The defendants' expert also stated that Calvert announced that he was sending Hero into the shed.  (*See id.* at 11).  Neither Calvert nor Brown testified in their affidavits that Calvert gave a warning that he was sending Hero into the shed after Brown shouted, "Dog, dog, dog."

White's expert, on the other hand, wrote in his report that "[c]anine 'Hero' did not bite one time.  The dog bit White numerous times on his right arm at minimum of eight times."  (Docket Entry No. 19-1, at 151).  Even White did not allege that Hero bit him *eight* times.  White alleged that Hero bit him twice; Officers Calvert and Brown alleged that Hero bit White once but got stuck on White's clothing for at least 30 seconds.

Finally, photographs of White's arm taken after he was arrested show bite wounds, but not clearly enough to show whether Hero bit White once, twice, or more.  (Docket Entry No. 1, at 9).  The photos are attached as an appendix to this opinion.

In sum, there is no conclusive set of facts on which the parties agree, or which the record undisputedly shows, as to the events after White's flight ended in the dead end of the shed.   When a defendant invokes qualified immunity, "the burden shifts to the plaintiff to show that the defense is not available."  *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016).  "But where factual disputes

exist," the court must "accept the plaintiff's version," if it is substantiated.  *Id.*  There are many

relevant disputed facts:

- White stated in his deposition that he fell face down into a shed in the backyard after he was tased by Officer Brown Officer Brown stated that White was not slowed by the taser and ran into the shed, where Brown saw him lying on the ground, on his stomach.

- Officer Brown alleged that White refused to show his hands, despite Brown's orders, and instead reached toward his waistband.  White asserted that he was lying on his stomach with his hands extended behind his back, and that he pleaded for Officer Brown to "cuff him," but Officer Brown falsely shouted that he was "reaching."

- As to the dog bite itself, Officers Brown and Calvert alleged that Hero responded to Calvert's verbal command to release his bite on White's arm, but that Hero's teeth remained entangled in White's jacket.  White testified that Officer Calvert allowed Hero to bite White, removed Hero, and then allowed Hero to bite White a second time.   White testified that he "d[idn't] know" his basis for saying that Officer Calvert instructed the dog to bite him a second time, instead of the dog acting on its own.  Any verbal command to the dog, however, would have been given in Hungarian.  (Docket Entry No. 17-3, at 5). Even Officer Brown did not understand Calvert's commands.  (*See* Docket Entry No. 17-1, at 5 ("I observed that within seconds of Officer Calvert entering the shed, placing his body behind K-9 Hero, and taking hold of K-9 Hero's harness, Officer Calvert began giving commands in a foreign language to K-9 Hero.")).  White claimed that for both bites, the dog bit his arm, and not merely his clothing.

There are some facts on which the parties agree.  The parties agree that Officer Calvert

could not see into the shed when Officer Brown shouted for the dog.  The parties agree that Hero

entered the shed and bit White after Officer Brown—the only officer who could see White—

shouted "Dog, dog, dog.  He's reaching.  Dog, dog, dog."

There is also the video footage from the body cameras.  "When opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion

for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Here, however, "[t]here is no

video footage plainly contradicting one party's version of events."  *Hinson v. Martin*, 853 F. App'x

926, 929 (5th Cir. 2021).    The recording is unfortunately obstructed at most of the incident's critical moments.

When "[t]he parties tell vastly different stories of what happened, and the video evidence exposes, rather than expunges, the disputed facts," the court accepts the plaintiff's version for the purpose of this motion.  *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 344 (5th Cir. 2020).    For this purpose, the court considers the construction of the relevant events as follows: White fell into the shed on his stomach after he was tased by Officer Brown, who was the only officer able to see White in the shed.    While lying on his stomach, White put his hands behind his back and told Officer Brown to handcuff him.    Instead, according to White, and not contradicted by the video recordings, Officer Brown yelled, "Dog, dog, dog.  He's reaching.  Dog, dog, dog."

Officer Calvert released the dog at Officer Brown's request, and the dog bit White's upper right arm.    Officer Calvert entered the shed about 20 seconds after Hero, stood behind the dog, got him off White, but then allowed Hero to bite White a second time.    It is unclear how long the first bite lasted before Calvert removed the dog from its grip on White's arm.    It is also unclear whether Calvert directed the dog to bite a second time or the dog acted on its own.    Whether the dog attacked White the second time with or without an order from Officer Calvert, it is unclear how long Officer Calvert allowed the dog to continue to bite White before trying to get him to release. Approximately 49 to 53 seconds after Hero was first let into the shed, Calvert repeatedly attempted to get Hero to release his grip by pulling on Hero's leash and shouting "Ereszd"—the Hungarian command for release.    The incident lasted a total of 75 to 90 seconds.    After the dog released its bite, White was removed from the shed and handcuffed.    White "suffered severe injuries to his arm and intense pain" from the bites, suffered a kidney infection requiring hospitalization that he

10

alleges was caused by "bacteria in the [dog's] mouth," and "has permanent scarring on his arm and suffers from ongoing pain and numbness." (Docket Entry No. 1, at 9; Docket Entry No. 19, at 10–11).

In short, the facts are disputed in ways material to this court's ability to decide the legal entitlement to qualified immunity for one of the officers who chased and arrested White, but there are sufficient undisputed facts relating to the other officer to allow the court to rule.

## II.     The Legal Standard for Summary Judgment on the Basis of Qualified Immunity

"Qualified immunity protects government officials from civil liability in their individual capacities to the extent that their conduct does not violate clearly established statutory or constitutional rights." *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016)); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When a defendant invokes qualified immunity, "the burden shifts to the plaintiff to show that the defense is not available." *Cooper*, 844 F.3d at 522. "But where factual disputes exist," the court must "accept the plaintiff's version," if it is substantiated. *Id.*

A plaintiff seeking to overcome qualified immunity must show: "(1) [that] the official violated a statutory or constitutional right, and (2) [that] the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Roque v. Harvel*, 993 F.3d 325, 331 (5th Cir. 2021). "These steps may be considered in either order." *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018).

The first prong requires the plaintiff to allege and prove facts that establish a violation of a constitutional right. *Pearson*, 555 U.S. at 232. The second prong requires the plaintiff to show that "'the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that

their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation

omitted).  In other words, "[t]o defeat qualified immunity, a plaintiff must demonstrate that 'it

would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted.'"  *Shumpert*, 905 F.3d at 321 (emphasis omitted) (quoting *Hernandez v. United States*,

785 F.3d 117, 120 (5th Cir. 2015) (en banc)).  "In determining what constitutes clearly established

law, this court first looks to Supreme Court precedent and then [to Fifth Circuit precedent].  If

there is no directly controlling authority, [the] court may rely on decisions from other circuits to

the extent that they constitute 'a robust consensus of cases of persuasive authority.'"  *Shumpert*,

905 F.3d at 320 (citation omitted).

## III.    Analysis

### A.    Officer Calvert

White alleges that Officer Calvert violated his Fourth Amendment rights by using

excessive force.  White alleges that:

> The amount of force used by Defendant Calvert . . . when Defendant Calvert
> released his K9 unit to attack Mr. White and then allowed his K9 unit to keep
> attacking Mr. White, both occurring after Mr. White had surrendered, was lying on
> the ground with his hands behind his back complying with the only order given to
> him to "stay back," was no longer resisting, was no longer evading arrest, and was
> not presenting a threat as his hands were empty and behind his back, was
> objectively unreasonable under the circumstances and inflicted unnecessary injury,
> pain, and suffering upon Mr. White.

(Docket Entry No. 1, at 10).

The first issue is whether there is a factual dispute as to excessive force.  The elements are

"(1) [an] injury, (2) which resulted directly and only from a use of force that was clearly excessive,

and (3) the excessiveness of which was clearly unreasonable."  *Elizondo v. Green*, 671 F.3d 506,

510 (5th Cir. 2012) (quoting *Collier v. Montgomery*, 569 F.3d 214, 218 (5th Cir. 2009)).  "[T]he

reasonableness of an officer's conduct depends on the 'facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Cooper*, 844 F.3d at 522 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Courts must "adopt 'the perspective of a reasonable officer on the scene, rather than [judge] with the 20/20 vision of hindsight.'" *Id.*

White's version of the disputed facts shows at least two separate incidents of force involving Officer Calvert, the first and the second dog bites.  The first bite allegedly occurred after Officer Calvert released Hero into the shed on Officer Brown's request ("Dog, dog, dog.  He's reaching.  Dog, dog, dog.").  The second bite allegedly occurred after Officer Calvert entered the shed, removed Hero from White's arm, but then ordered or allowed Hero to bite White again and for an unspecified length of time.

The Fifth Circuit has, on several occasions, considered the related questions of whether an officer's use of a canine unit was excessive force and whether the officer was entitled to qualified immunity.  In *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016), the Fifth Circuit examined qualified immunity for an officer who allowed a police dog to bite the plaintiff for "one to two minutes." *Id.* at 521.  In that case, Cooper, the plaintiff, fled from police after he was pulled over on suspicion of driving under the influence.  *Id.*  A K-9 unit responded to a request for backup.  *Id.*  Hiding from the police, Cooper "took shelter inside a 'cubbyhole,' a small wood-fenced area used to store trash bins between two houses."  *Id.*  "Upon entering the residential neighborhood . . . [the police dog] discovered Cooper in his hiding place and bit him on the calf."  *Id.*  The parties disputed "whether [the dog] initiated the attack or whether, instead, [the dog handler] ordered it."  *Id.*  The police dog

13

"continued biting Cooper for one to two minutes.  During that time, Cooper did not attempt to flee or to strike [the dog], and . . . [Officer] Brown testified that he could see Cooper's hands and could appreciate that he had no weapon.  Brown then ordered Cooper to roll onto his stomach.  He complied, and Brown handcuffed him.  But he did not order [the dog] to release the bite until after he had finished handcuffing Cooper."  *Id.*

The Fifth Circuit held that Officer Brown was not entitled to qualified immunity because his use of canine force was excessive and unreasonable.  *Id.* at 522–23.  The court applied the *Graham* factors, analyzing the reasonableness of an officer's conduct by examining "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 522 (quoting *Graham*, 490 U.S. at 396).  The court found that the first factor favored Officer Brown—a "DUI is a serious offense"—but the other factors favored Cooper.  *Id.*

On the second factor, "whether the suspect poses an immediate threat to the safety of the officers or others," the court wrote that, "[n]o reasonable officer could conclude that Cooper posed an immediate threat to Brown or others.  Cooper was not suspected of committing a violent offense, and Brown testified that" the officer who pulled Cooper over on suspected drunk driving, "had not warned that Cooper might be violent.  Moreover, Brown could see Cooper's hands and knew he had no weapon."  *Id.* at 522–23.  The officer who stopped Cooper also "testified that although he did not know whether Cooper was armed, he had no reason to believe that Cooper had a weapon."  *Id.* at 521.

On the third factor, "whether [Cooper was] actively resisting arrest or attempting to evade arrest by flight," the court wrote that "Cooper was not actively resisting arrest or attempting to flee

or to strike" the police dog.  "The only act of 'resistance' that Brown identifies is Cooper's failure to show his hands because, although they were on [the dog's] head and visible to Brown, Brown wanted Cooper to raise his hands.  Given that [the dog] was still latched onto Cooper's calf at the time, the failure to raise his hands can hardly be characterized as 'active resistance.'"  *Id.* at 523.

The court stated, "[m]oreover," that "Brown was required to 'assess not only the need for force, but also the relationship between the need and the amount of force used.'"  *Id.* (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)).  "Brown subjected Cooper to a lengthy dog attack that inflicted serious injuries, even though he had no reason to believe that Cooper posed a threat, and without first attempting to negotiate.  And he continued applying force even after Cooper was actively complying with his orders. . . .  [T]here was no reason for Brown to permit Sunny to continue attacking once Cooper was on his stomach."  *Id.*  The court emphasized that "caselaw makes certain that once an arrestee stops resisting, the degree of force an officer can employ is reduced."  *Id.* at 524.  The court concluded that "[t]he undisputed facts establish[ed] that Brown's use of force was objectively unreasonable."  *Id.*

In *Shumpert v. City of Tupelo*, 905 F.3d 310 (5th Cir. 2018), the Fifth Circuit again considered whether the use of a police dog was excessive force.  The facts are similar to this case and to *Cooper*.  The plaintiff, Antwun Shumpert, Sr., fled from police after he was pulled over "for failing to use a turn signal and driving without a working tag light."  *Id.* at 315.  The officers, "including Officer Cook who was in the area with his police K9, pursued Shumpert" and "eventually located [him] hiding in a crawl space under a house."  *Id.*  Officer Cook testified that he gave Shumpert a command to come out and show his hands, and warned that he had a dog that would bite.  *Id.*  "After this warning, Shumpert ran further under the house, prompting Officer

15

Cook to release his dog which then bit Shumpert." *Id.* "Officer Cook testified that Shumpert began to fight the dog [and] then ran from under the house and tackled Officer Cook." *Id.* at 315–16. "Shumpert pinned Officer Cook to the ground and repeatedly struck him in the face. Fearing he was about to lose consciousness, Officer Cook shot Shumpert four times." *Id.* at 316.

In analyzing whether the use of the police canine was excessive force, the court contrasted the facts in *Shumpert* from *Cooper*. The court wrote, "[b]ecause the officer in *Cooper* continued to use force and even increased its use while the threat to officers decreased, he violated clearly established law. By contrast, Officer Cook did not use or increase the use of force after Shumpert was subdued; instead, Shumpert ignored Officer Cook's instructions and retreated further under the home, preventing Officer Cook from determining whether he was armed." *Id.* at 323. The court held that the use of the police canine was reasonable, noting that it "has repeatedly held that the 'measured and ascending' use of force is not excessive when a suspect is resisting arrest—provided the officer ceases the use of force once the suspect is subdued." *Id.*

In *Escobar v. Montee*, 895 F.3d 387 (5th Cir. 2018), the Fifth Circuit again considered qualified immunity in a case involving a suspect who fled from the police and a police canine. Israel Escobar fled from the police with a knife after assaulting his wife. *Id.* at 390. "While chasing him, the police were informed—by Escobar's mother—that they would have to kill him to get him." *Id.* "The police eventually found Escobar in a backyard and released a dog to capture and hold him. Escobar was bitten by the dog until fully handcuffed by the police, even though he avers that he dropped the knife and lay flat on the ground once discovered." *Id.* Escobar claimed that "he was trying to surrender" and asserted that "both the initial bite and the continued biting were excessive force in violation of the Fourth Amendment." *Id.* The district court had previously

16

dismissed the initial-bite claim on a Rule 12(b)(6) motion, and then denied Officer Lance Montee—the dog's handler—summary judgment on his qualified immunity defense. *Id.*

The Fifth Circuit held that Officer Montee had not used excessive force by permitting the police dog to continue biting Escobar until he was "fully subdued and in handcuffs," "approximately one minute." *Id.* at 391. The court noted that "the police were informed that he had a knife," that Escobar's mother had warned that they would "have to kill Escobar to catch him; he would not go without a fight," and that while Escobar had dropped his knife on the ground before the dog bit him, "the knife remained within Escobar's reach." *Id.* at 390–91. The court also noted that "the police were rightly informed that Escobar had committed a felony assault; and Escobar had fled into the night through multiple backyards before hiding for approximately twenty minutes." *Id.* at 394.

The court noted that the second *Graham* factor—"whether Escobar posed a threat"—was "the focus of the dispute" on appeal. *Id.* "According to Escobar and the district court, a reasonable jury could find that [Officer] Montee allowed" the police dog "to continue biting after it would have been apparent 'that Escobar was no longer armed and was not resisting arrest.'" *Id.* The Fifth Circuit disagreed:

> This reasoning overlooks several key facts: The chase was at night; Escobar had hidden from the police for twenty minutes in a neighbor's backyard; the chase, along with the warnings from Escobar's mother, would lead a reasonable officer to believe that, as he had apparently promised, Escobar would not go without a fight; and the knife remained within Escobar's reach, ready to be used. In the face of such facts, a reasonable officer could believe that Escobar's "surrender" was a ploy and that he was ready to snatch the knife again once the dog was removed.

*Id.*

The court continued: "[a]lthough, as with the suspect in *Cooper*, Escobar's hands were visible and he complied with Montee's commands, much unlike the situation in *Cooper*, Escobar had a knife within reach, and Montee had reason to believe he still posed a threat." *Id.* For these reasons, Officer Montee's actions in allowing the police dog to bite Escobar until he was handcuffed were reasonable under the Fourth Amendment.

Finally, in a recent unpublished opinion, *Hinson v. Martin*, 853 F. App'x 926 (5th Cir. 2021), the Fifth Circuit considered a district court's denial of summary judgment on qualified immunity in a case involving a police dog. James Henson, who was "wanted on a felony arrest warrant for armed robbery involving a firearm," fled on foot from police after he was pulled over. *Id.* at 927. Officer Martin "deployed Rex," the police dog, "and both pursued Hinson into the woods. After approximately 200 yards, Rex caught Hinson by the arm and took him to the ground." *Id.* The parties disputed what happened next, so the court accepted Hinson's version of the disputed facts. Hinson alleged that the dog "initially bit him on the wrist, at which point he voluntar[il]y went to the ground with the canine," and that "he ceased any attempts to escape or resist and submitted to commands from that point on. Nonetheless, [Officer] Martin cursed at him, hit Rex, and gave Rex a command that caused Rex to bite Hinson several more times on the upper arm. . . . While Hinson lay handcuffed on the ground," Rex "bit[] down on Hinson's forearm and [did] not let go." *Id.* (emphasis omitted). The question was whether Officer Martin's use of force, through the police dog, was reasonable "after Hinson had been subdued." *Id.*

The court held that Officer Martin's "alleged decision to order Rex to bite Hinson and to personally kick Hinson in the ribs after he was subdued was objectively unreasonable." *Id.* at 932. "[A]t that point," the court noted, "[Hinson] was no longer fleeing or offering active resistance.

18

He was obeying officer commands and, particularly once handcuffed, could not reasonably be believed to pose a continuing threat to officers that would justify superfluous dog bites." *Id.* "[T]he district court did not err in finding that a jury could reasonably conclude that ordering Rex to continue biting Hinson after he was subdued, and kicking him after he was handcuffed, constituted excessive force in violation of Hinson's Fourth Amendment rights." *Id.* at 933.

Considering Fifth Circuit precedent and applying the *Graham* factors, it is clear that Officer Calvert did not use unreasonable excessive force by allowing Hero to bite White the first time. The first *Graham* factor, "the severity of the crime at issue," favors White. Officer Brown pulled White over for failing to turn without signaling. The suspects in *Shumpert*, *Escobar*, and *Hinson* had all fled from police after they had committed, or were wanted on arrest warrants for, violent felony offenses, and one was armed with a knife. *Cooper* involved a more serious traffic-related offense—driving while intoxicated. While Officer Brown thought that White's car matched the description of a citizen report of a person possibly involved in a drug offense, Officer Brown had not confirmed that White was, in fact, involved in any illegal activity when he fled, much less any violent activity.

The second two factors favor Officer Calvert. He testified that Officer Brown's call for backup after he lost sight of White included the statement that Brown saw White "reaching into his waistband" as he fled. (Docket Entry No. 17-4, at 12). The officers chased White for over two hours as he repeatedly courted disaster to escape arrest, including running across a major highway and jumping over a 10-foot barbed-wire fence. When the officers cornered White in a residential backyard, White still refused to surrender, continuing to try to escape. (Docket Entry No. 17-1, at 3; *see also* Docket Entry No. 19-1, at 251 (Q: "[I]f you were running to get away from Officer

Brown, why didn't you surrender to one of those other officers that you saw that night?"  A: "I didn't want to get beat.  I—you know, all officers when they get ahold of you, they—it gets—it gets real. . . .  I was afraid for my life.  Really, I was running.")).  Only after White was hit with Officer Brown's taser did White allegedly fall into the shed.  Although White alleged that the taser impacted him, Officer Calvert observed that "[t]he taser had no effect" on White.  (Docket Entry No. 17-3, at 4).  At no point in time, visible to Officer Calvert, did White voluntarily surrender.  A reasonable observer in Calvert's position would believe that White was willing to do anything to escape police capture.

Officer Brown was the only officer able to see White inside the shed when Brown yelled, "dog, dog, dog.  He's reaching.  Dog, dog, dog."  Officer Calvert did not see whether White was armed or if he was complying with Officer Brown's commands.  He heard Officer Brown, who had White in his line of sight, warn that White was "reaching" and yell for the dog.  When asked why he allowed the dog to "engage with Mr. White," Officer Calvert testified, "Because he was still actively evading, the taser didn't work, another officer requested the dog, and he was reaching into his waistband where weapons are known to be kept."  (Docket Entry No. 17-4, at 43).

Based on this record, it was objectively reasonable for an officer in Officer Calvert's position to believe that White still posed an immediate threat to Officer Brown and other officers, and that White was continuing to attempt to evade arrest.  *See Wagner v. Bay City*, 227 F.3d 316 (5th Cir. 2000) ("[E]ven law enforcement officials who reasonably but mistakenly use excessive force are entitled to immunity.") (quoting *Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir. 1998)).  The use of the canine to apprehend White by biting his right arm was not unreasonable, even if it was, as White alleges, based on the mistaken premise that White was

"reaching." *See Shumpert*, 905 F.3d at 323 (The "court has repeatedly held that the 'measured and ascending' use of force is not excessive when a suspect is resisting arrest.").

The alleged second bite is more problematic.  The facts surrounding this second bite are less clear.  Officer Brown and Officer Calvert testified that there was no second bite and that the dog just got his teeth stuck in White's jacket.  Officer Calvert stated that after he entered the shed, "[he] told White to stop fighting and to put his hands behind his back.  When White finally complied with [his] direction, [he] gave K-9 Hero the Hungarian command to release . . . .  Within seconds of confirming White was not armed, [he] gave Hero the command to release his grasp on White's arm.  Hero responded to [his] verbal command but his teeth were entangled in White's jacket so Hero could not immediately release his grasp on White's jacket."  (Docket Entry No. 17-3, at 5).  White, however, testified that the dog at first fully released his bite, but then "grabbed [White's] arm" a second time.  (Docket Entry No. 19-1, at 267).  White was unable to provide many other details of the second bite.  White testified that he did not know how much time passed between the first and second bites.  (*See id.*, at 268).  White also testified that Officer Calvert "put the dog back on [him]" the second time, but he could not identify anything that "made [him] think that [Officer Calvert] gave the dog a new command between the first bite and the second bite," because "[he] was in hysteric shock during that time."  (*Id.*, at 272; *see also id.*, at 273 ("I heard him, but I can't recall no command.  I heard him talking.")).

Because neither party identified how much time passed between the time of the first bite and the second bite (or, according to the officers, the timing of when the dog got his teeth stuck in White's jacket), it is unclear how long it took for Officer Calvert to get the dog to fully release his grip on White.  Approximately 49 to 53 seconds after the dog was released into the shed, Officer

21

Calvert took repeated actions to get the dog to release its bite, including giving the verbal command to release about six times.  But there is no clear evidence as to how long Officer Calvert allowed the dog to bite and hold White's arm for a second time (or allowed the dog to remain stuck on White's shirt) before giving the release command.  *Cf. Cooper*, 844 F.3d at 524 ("Even if the dog attacked of its own volition, [Officer] Brown permitted the attack to continue for one to two minutes.").

A jury could find that Officer Calvert directed and allowed the dog to continue biting after Calvert had already determined that White was no longer a threat.  A jury could alternatively find that Officer Calvert took rapid steps to remove the dog after figuring out that its teeth were stuck in White's sleeve.  Based on the disputed facts, the court cannot make the choice.  If the jury found that Calvert acted with reasonable speed as soon as he realized that the dog could not release White's arm, then Calvert's use of force may not have violated White's Fourth Amendment rights.  Under that scenario, Calvert was not "permit[ting] [the dog] to continue biting a compliant and non-threatening arrestee," *Cooper*, 844 F.3d at 524, but instead was trying to get the dog to release White.  But at this stage in the proceedings, "disputed issues such as when [the police dog] initially engaged and released his hold on plaintiff's [arm], the duration of the bite, and the timing of the commands given by [Officer Calvert] preclude a finding on whether [Officer Calvert] used excessive force via [the police dog] and whether such force was objectively reasonable." *Ballard v. Hedwig Vill. Police Dep't*, No. H-08-0567, 2009 WL 2900737, at *9 (S.D. Tex. Sept. 2, 2009), *aff'd*, 408 F. App'x 844 (5th Cir. 2011).

The court assesses the reasonableness of Officer Calvert's actions based on White's testimony that Calvert "pulled the dog off of [White] and "told [White] to stop resisting arrest,"

even though "[White] wasn't resisting.  And then he put the dog back on [White]."  (Docket Entry No. 19-1, at 272).  Viewing the conflicting evidence in the light most favorable to White could lead a reasonable factfinder to conclude that Officer Calvert's role in the police dog's second bite violated the Fourth Amendment.

All the *Graham* factors favor White.  "[T]he severity of the crime at issue" was low.  Failing to turn without signaling, even given the citizen report of possible involvement in a suspected drug transaction, does not suggest that White posed a threat to officers.   And the record does not show that White "posed an immediate threat to the safety of the officers or others" by the time of the second bite.  Officer Calvert testified in his declaration that "[he] entered the shed" to remove the dog from White "[a]s soon as [he] was able to visually confirm that White was not holding a weapon."  (Docket Entry No. 17-3, at 4).  By the time Officer Calvert removed the dog the first time, Officer Calvert had already confirmed that White was not armed.  Finally, White was no longer "actively resisting arrest or attempting to evade arrest by flight."  The video footage shows that White would have been unable to evade arrest.  By the time Officer Calvert entered the shed, White was on the ground, trapped, with multiple officers standing inside and outside of the shed.  "This location, combined with the dog physically keeping him from going anywhere, left [White] with no meaningful way to evade police custody."  *Bartlett*, 981 F.3d at 340 (citing *Cooper*, 844 F.3d at 526).

White also testified that he was no longer resisting arrest.  In body camera footage, Officer Calvert can be heard telling White to stop resisting, but the footage does not show White resisting in any way.  A suspect's failure to comply promptly or fully with officer commands "can hardly be characterized as 'active resistance'" when an individual is struggling in response to the attack

23

of a large biting dog, and even trying to push it away, both natural reactions. *Cooper*, 844 F.3d at

634; *see also id.* (quoting *Malone v. City of Fort Worth¸* No. 4:09-cv-634, 2014 WL 5781001, at

*10 n.5 (N.D. Tex. Nov. 6, 2014) ("The Court wonders how a man, who is prone on the ground

and being attacked by a dog, can reasonably be expected to expose his hands and unflinchingly

hold them behind his back.")). Whether White was resisting, not resisting, or simply reacting to

the pain of the bite is unclear. (*See* Docket Entry No. 19-1, at 149 (when a person is attacked by

a police dog, "[t]he person will writhe which is a normal reaction to a human being bit by an

animal. This does not mean the suspect was resisting. It means that the dog bite is unbelievably

painful.")). The record is replete with factual disputes material to determining whether White was

resisting to a degree that warranted the continued application of force. The court cannot resolve

those disputes at this stage, given the conflicting evidence as to whether, and when, White was

still resisting arrest.[1]

Even if Officer Calvert violated White's constitutional right to be free from police use of

excessive force, he is still entitled to immunity from suit if the right was not clearly established at

the time of the violation. *Cooper*, 844 F.3d at 522. "Generally, to satisfy this standard, the plaintiff

must 'identify[] a case in which an officer was acting under similar circumstances was held to have

violated the [Constitution], and … explain[] why the case clearly proscribed the conduct of that

individual officer.'" *Cope v. Cogdill*, 3 F.4th 198, 205 (5th Cir. 2021) (alterations in original)

(quoting *Bartlett*, 981 F.3d at 345). "While an exact case on point is not required, the confines of

---

[1] Although not taken into account for the determination of qualified immunity, the court is disturbed by body camera footage that shows Officer Calvert smiling as the dog attacked White. In his deposition, Calvert acknowledged that he was smiling and explained that he "was smiling because it was [his] dog's first bite." (Docket Entry No. 17-4, at 49). The infliction of severe pain on a suspect—whose screams are audible in video footage—is not cause for celebration in any circumstance.

the officers' violation must be 'beyond debate.'" *Id.* (quoting *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020)).

There are many cases that "clearly proscribe[] the conduct" of Officer Calvert.  It is clearly established that "once an arrestee stops resisting, the degree of force an officer can employ is reduced." *Shumpert*, 905 F.3d at 323 (quoting *Cooper*, 844 F.3d at 524).  While "measured and ascending use of force is not excessive when a suspect is resisting arrest," the force must be "cease[d] . . . once the subject is subdued." *Id.*  The Fifth Circuit has considered the use of excessive force in police dog bite cases several times.  The facts vary, but each case establishes that police force exercised through a police dog is unconstitutionally excessive when used after the target is compliant and does not pose a risk of harm or flight. *See Cooper*, 844 F.3d at 525–26; *Hinson*, 853 F. App'x at 933 ("The *Cooper* court was also able to point to a robust consensus of opinion that an unnecessary or unnecessarily prolonged dog bite was unconstitutional."); *see also Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018) ("In *Cooper v. Brown* . . . we distinguished the initial use of a dog bite to restrain a suspect from the continued application of that same bite once the suspect was no longer resisting.").  While White was not handcuffed when he was allegedly bit for the second time, unlike the plaintiffs in *Escobar* and *Hinson*, he was lying on his stomach on the ground of the shed, was surrounded by multiple officers, had been bitten once, and, according to White, had been tased before that.  Officer Calvert had already confirmed that White was not armed.  Based on these facts—specifically, the disputed facts viewed in favor of White's version—Officer Calvert was on notice that directing, or allowing, the dog to bite White a second time was excessive force that violated the Fourth Amendment.

The court finds that factual disputes preclude granting summary judgment on this record on the basis of qualified immunity as to all parts of White's excessive force claim against Officer Calvert. But the court limits the claim, and to that extent denies qualified immunity on this record, to the force that allegedly occurred after the police dog released its initial bite. Material factual disputes remain as to the number of bites, the timing and duration of the bites, and whether Officer Calvert instructed the dog to bite White for a second time or if the dog acted on its own, or whether the dog released White's arm after the first bite but remained entangled in White's clothing. These disputed facts prevent judgment that, as to the second bite, Officer Calvert did not use excessive force in violation of White's Fourth Amendment rights.

### B.   Officer Brown

White also alleges that Officer Brown is liable on a theory of bystander liability. White alleges that:

> Defendant Brown had a reasonable opportunity, had he been so inclined, to prevent Defendant Calvert from violating Mr. White's rights by releasing the K9 unit to attack him, but he failed to do so. . . .  Defendant Brown knew that Defendant Calvert was about to violate Plaintiff's constitutional rights by using force on him without legal justification when he called out for Defendant Calvert to release the K9 unit by screaming, "Dog, dog, dog." However, Defendant Brown yelled for a dog to attack Mr. White despite seeing that Mr. White was lying on his stomach with his empty hands behind his back in a position of surrender, had just told Defendant Brown to "cuff" him, was contained inside of a small shed, was vastly outnumbered by officers directly outside of the shed, and was complying with the only order being given to him, which was to "stay back." Thus, Defendant Brown was aware that when Defendant Calvert released the K9 unit to attack Mr. White, doing so would be a use of excessive force in violation of Mr. White's constitutional rights. Despite knowing that Mr. White was no longer evading, not resisting, had no weapon in his hand, was lying on his stomach with his empty hands behind his back in an obvious position of surrender, and was complying with the only order given to him which was to "stay back," Defendant [Brown] did not tell Officer Calvert not to release the K9 Unit. Defendant Brown had a reasonable opportunity to prevent the harm because he could have told Defendant Calvert[] not to release the K9 unit after calling out "Dog, Dog, Dog."

26

(Docket Entry No. 1, at 14–16).

White's bystander liability claim is unusual.  Generally, a bystander liability claim asserts that an officer should have reasonably believed that he or she was "required to intervene and prevent" another officer's use of excessive force, even though he or she played no role in the other officer's decision to use such force.  *See, e.g.*, *Deshotels v. Marshall*, 454 F. App'x 262, 269 (5th Cir. 2011).  White does not simply allege that Officer Brown should have intervened and prevented Officer Calvert from using excessive force.  He alleges that Officer Brown incited or provoked Officer Calvert to unwittingly use excessive force by requesting canine assistance despite knowing that White was no longer either a flight risk or armed.

Assuming, however, that these allegations are properly cast as a bystander liability claim, "an officer may be liable under § 1983 under a theory of bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'"  *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citation omitted).  White has not met his burden to show that Officer Brown is not entitled to immunity.

White alleges that Officer Brown knew that Officer Calvert would violate White's constitutional rights by deploying the dog, because Officer Brown knew that White was no longer a threat of either flight or harm to officers.  Of course, Officer Brown and White describe the events differently.  According to Officer Brown, White was lying on his stomach on the floor of the shed.  Brown "repeated commands for White to show [him] his hands but he did not comply with [Brown's] commands. . . .  Instead of placing his hands in [Brown's] view, [Brown] perceived White to move a hand toward his waistline so [he] immediately called for a dog to assist [him]."

27

(Docket Entry No. 17-1, at 3–4).  According to White, White was lying on the floor of the shed on his stomach with both hands behind his back, telling Brown to "cuff [him]" and pleading "please, Brown, don't put the dog on me.'"  (Docket Entry No. 17-5, at 62).

Even if White's hands were clearly behind his back, in a position to be handcuffed, and even if White verbally signaled that he was ready to be handcuffed, the evidence does not negate Brown's testimony that he *perceived* White to move a hand toward his waistline, and the evidence does not negate Brown's testimony that he could not see White's hands, given the darkness of the shed at night.  (*See* Docket Entry No. 17-2, at 22 ("So I couldn't see his hands, but he was making the movements with his hands towards his—towards his mid-section.")).  White also recognized that "[Officer Brown] felt as if I was still not complying with his rules, and like I had a weapon. He said I had something.  I had a weapon, or whatever, and that's when he put the dog on me.  I didn't have nothing in my hands."  (Docket Entry No. 19-1, at 263).  During the chase, Officer Brown had seen White "running away . . . and reaching for his waistband."  (Docket Entry No. 17-3, at 2; Docket Entry No. 17-1, at 2 ("When I called out to White to get back inside his vehicle, he reached toward the waistline of his shorts and ran northeast.")).  Brown stated that he was standing outside the shed when the officers cornered White, because the shed was unlit, and he "believed it was unsafe for [him to enter] without confirming that White was unarmed.  Not only did [he] not know whether White was armed when he entered the shed, [he] did not know what was stored in the shed that could be used as a weapon against [him] or other officers."  (Docket Entry No. 17-1, at 3–4).  Brown also stated that it was "apparent that White was going to extraordinary lengths to avoid arrest," and an officer in Brown's position could reasonably believe that White would not

surrender without further resistance, given White's extreme measures to avoid arrest during the two-hour chase.

While White may not have had any visible weapon in his hands, Brown had an objectively reasonable basis to fear that White was still armed.  The record, particularly the video evidence, shows that it was dark.  The only source of light was from the officers' flashlights.  Officer Brown thought that White might be armed from his initial encounter with White and had conveyed that concern to other officers earlier in the night.  Officer Brown had just seen White take two and a half hours of drastic measures to escape arrest.  These facts are similar to those in *Escobar*, when the Fifth Circuit held that an officer's force, through a dog bite, was not excessive even though the plaintiff had "dropped his knife and la[id] flat on the ground 'like a parachute man'" "once he heard the dog and officers approaching," but the knife remained "within Escobar's reach."   895 F.3d at 390–91.  In *Escobar*, the officers knew with certainty that Escobar was armed and could see the knife.  In this case, the officers did not know that White was armed and could not see the weapon, but a reasonable officer, given the totality of the circumstances, may have concluded, based on earlier observations, that a weapon remained within reach, and that White might use it to threaten the officers or to continue trying to evade arrest.

Brown also testified that when he called for help from the canine handling officer, Brown did not know that the dog would bite White.  There is no evidence that by asking for help from the canine team, Officer Brown was "directing [the dog] to bite White or even asking that Officer Calvert direct [the dog] to bite White."  (Docket Entry No. 22, at 17).  The following exchange occurred during Officer Brown's deposition:

> Q.     So when you called for the "Dog, dog, dog," what were you intending to happen based off of that call?

A.      An apprehension of Mr. White.  I'm not a K-9 handler, but I was calling the dog and his handler to help me out.

Q.      When you called, "Dog, dog, dog," you expected that the K-9 was going to help apprehend Mr. White, correct?

A.      I expected the K-9 and his handler to assist me.  That's correct.

Q.      Okay.  And in what way did you expect him to assist you?

A.      When I called, "Dog, dog, dog," that is me calling—me requesting the help from the handler, Officer Calvert; and at that point, you know, he would make the—he would make the judgment.

…

Q.      Okay.  And the assistance of a dog in that situation would require the dog to bite Mr. White, correct?

A.      Not all—not all times, no sir.

Q.      But you know that is a possible outcome of a dog becoming involved in the situation, correct?

A.      It's possible, but it doesn't always end that way.

…

Q.      And what was it in your mind that you wanted the dog to do to assist?

A.      There could be—there's multiple options.  Ultimately, if a bite was necessary, that was—that would be the outcome.  I needed the assistance of the dog because I was—I refused to enter the shed with Mr. White given the facts of the case.

(Docket Entry No. 17-2, at 29–32).

The evidence does not show that an officer in Brown's position reasonably would know, or should have known, that when Brown requested the dog's assistance, the dog would bite White for a prolonged and excessive period.  The defendants' expert, Jason Stanze—who "trained police

30

service dog Hero and his handler Officer Calvert"—stated that "Hero was trained to utilize [a] variety of methods to exhibit K-9 forms of command presence to encourage a suspect's compliance with officer commands, without the K-9 or an officer resorting to physical force.  Mere command presence is no force at all."  (Docket Entry No. 17-6, at 10).  Indeed, Officer Calvert testified that the dog had never bitten anyone before on duty, (Docket Entry No. 17-4, at 49), even though the dog had "ha[d] 100 captures as a working police dog."  (Docket Entry No. 17-6, at 9).  White's expert on canine force, Ernest Burwell, did not address whether a person in Officer Brown's position reasonably should have, or could have, known that a request for canine assistance would likely result in multiple or prolonged dog bites.

Bystander liability applies when an officer "knows that a fellow officer is violating an individual's constitutional rights" and has a "reasonable opportunity to prevent the harm.".  Whitley, 726 F.3D at 646 (citation omitted).  The record shows that Officer Calvert did not violate White's rights when he released the dog and allowed him to bite White for the first time.  The record shows that only Officer Calvert, and not Officer Brown, could have prevented harm to White from the second bite.  A required element of a bystander liability claim is that officers "ha[d] a reasonable opportunity to prevent the harm."  *Whitley*, 726 F.3d at 646 (citation omitted).  The dog was under the direct control of Officer Calvert, and Officer Calvert alone.  (*See* Docket Entry No. 17-6, at 9 ("I taught Officer Calvert the same as K-9 Hero.  A K-9 cannot be certified without its handler; the pair is certified as a team.")).  "Hero was trained to respond to [Officer Calvert's] commands, not Officer Brown's comments.  Officer Brown had no ability to give any command to K-9 Hero or otherwise control K-9 Hero."  (Docket Entry No. 17-3, at 8).  Hero was trained to respond only to commands in Hungarian, not English, and Officer Brown did not know those

31

commands.  (*Id.*, at 5).  The events also took place in a time span of no more than 90 seconds, with the second bite lasting for some time less.  "Given the short time frame and the dog's inability to understand English or take directives from anyone other than [Calvert]," Officer Brown, "did not have a reasonable opportunity to intervene."  *Ballard*, 2009 WL 2900737, at *10.

Even if Officer Brown had violated White's Fourth Amendment rights by erroneously, or worse—falsely—shouting that White was "reaching" and requesting Hero's assistance, Officer Brown would still be entitled to immunity, because White's bystander liability claim was not clearly established at the time.  *Cooper*, 844 F.3d at 521.  The Fifth Circuit has considered bystander liability only a few times.  In *Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995), the plaintiff, Billy J. Hale, alleged, in part, that an officer had "stood by and laughed" and "yelled encouragement" as another officer "slammed Hale against the car; rammed his fist into Hale's testicles; and repeatedly tried to slam Hale's head into the car."  *Id.* at 919.  The court held that there was evidence "sufficient to create a genuine issue of material fact regarding [the officer's] acquiescence in the alleged use of excessive force," because the evidence "raise[d] a fact issue as to whether [the officer] had a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it."  *Id.*

In comparison, in an unpublished decision, *Deshotels v. Marshall*, 454 F. App'x 262 (5th Cir. 2011), the Fifth Circuit held that officers were entitled to qualified immunity on a claim of bystander liability.  *Id.* at 268–69.  In *Deshotels*, an officer lethally tased an alleged burglary suspect after the suspect attempted to evade arrest and "failed to surrender his hands."  *Id.* at 264.  The plaintiffs alleged that four officers were liable "for failing to prevent [another officer's] alleged use of excessive force when he tased Deshotels."  *Id.* at 268.  The plaintiffs "maintain[ed] that [the

32

officers] had an opportunity to realize that O'Rourke was going to tase Deshotels and to intervene and stop him." *Id.* The Fifth Circuit disagreed, holding that there was not clear law "in effect at the time of arrest" that "required [the officers] to intervene and prevent O'Rourke's alleged use of excessive force." *Id.* The court noted that "[t]he facts in *Hale* [were] significantly different from the facts in this case. In *Hale*, the plaintiff produced evidence that he was beaten by a police officer while the bystander officer stood by and laughed, making no effort to intervene. Nothing in *Hale* provided police officers 'fair notice' that officers actively engaged in restraining a large, potentially dangerous suspect are required to intervene and prevent another officer's use of excessive force." *Id.*

In another bystander liability case, *Whitley v. Hanna*, 726 F.3d 631 (5th Cir. 2013), the plaintiff, Natasha Whitley, alleged that the former City of Brownwood police sergeant sexually abused her as a minor. *Id.* at 634. The officer who allegedly abused Whitley, Vincent Ariaz, had previously been the subject of a department investigation, that found that Ariaz had abused another female participant in the City of Brownwood's "Explorer Post 1150," which "was established to teach [young people] about law enforcement, including police training and operations." *Id.* at 635. Despite these findings, Ariaz continued as a police officer for the City of Brownwood. *Id.* "Sometime thereafter, Ariaz's attention shifted to another Explorer participant—fifteen-year-old appellant Natasha Whitley." *Id.* Defendant John Hanna learned of Ariaz's inappropriate conduct with Whitley on July 3, 2007, and with other officers launched an "investigation into Ariaz's conduct and agreed that Hanna would continue monitoring Ariaz to catch Ariaz in the act of abusing Whitley, and thus strengthen the prosecutorial case against him." *Id.* at 636. Over the next several days, the officers installed video surveillance cameras that caught "Ariaz repeatedly

hugg[ing] and kiss[ing] Whitley," and on July 12, 2007, Hanna arrested Ariaz after he "witnessed Whitley sitting or lying on a table with Ariaz positioned over her." *Id.* Ariaz was indicted on 25 counts of sexual assault of a child and two counts of indecency with a child and received a 20-year prison sentence. *Id.*

In 2011, Whitley filed suit against Hanna and other officers, in their individual capacities. "Her complaint primarily contended that Appellees violated her constitutional rights by failing timely to intervene to stop Ariaz's abuse of her." *Id.* The district court and the Fifth Circuit held that Whitley failed to state a claim as to any of the defendants. *Id.* at 638–39. The Fifth Circuit held that Whitley had not alleged a bystander liability claim against Hanna because "she ha[d] not alleged that Hanna acquiesced in Ariaz's conduct," instead "Hanna was investigating Ariaz with the intent of gathering evidence to secure Ariaz's conviction for sexual abuse of a minor." *Id.* at 647.

Most recently, in *Timpa v. Dillard*, --- F.4th ---, 2021 WL 5915553 (5th Cir. Dec. 15, 2021), the Fifth Circuit considered a surviving family member's claims against officers for using excessive force and bystander liability. The family alleged that the officers caused Anthony Timpa's death "while he was being restrained . . . after he called 911 and asked for assistance during a mental health episode." *Id.* at *1. Officers had handcuffed Timpa, when he laid "barefoot on his back on [a] grass boulevard beside a bus bench, yelling: 'Help me! … You're gonna kill me!'" *Id.* at *2. "The Officers attempted to calm Timpa. Timpa rolled back and forth on the grass, then rolled close to the curb of the street." *Id.* Two officers, Officer Dillard and Officer Vasquez, "immediately forced Timpa onto his stomach and each pressed one knee on Timpa's back while a security guard restrained his legs." *Id.* "Vasquez removed his knee after

approximately two minutes.  Dillard continued to press his knee into Timpa's upper back in the prone restraint position for fourteen minutes and seven seconds," even though just one minute into the restraint Timpa yelled "I can't live!"  *Id.*  Timpa was "limp and nonresponsive for the final three-and-a-half minutes of the restraint."  *Id.*  Timpa's family brought an excessive force claim against Officer Dillard, and bystander liability claims against other officers on the scene.

The district court dismissed the bystander liability claim on the ground that no law clearly established the defendants' conduct as a constitutional violation.  The Fifth Circuit reversed.  *Id.* at *3.  The court held that Officers Vasquez and Dominguez, who "stood mere feet away from Timpa throughout the fourteen-minute duration of the restraint" were not entitled to summary judgment on the basis of qualified immunity because both officers "testified that they were aware of the risks of holding an arrestee in the prone restraint position," and did not "lack[] reasonable opportunity to intervene.  Indeed, both officers stood by, observed Timpa suddenly lose consciousness, expressed surprise, and then made jesting comments."  *Id.* at *13.  Citing *Hale*, the court stated, "[t]hat both officers 'stood by and laughed' while Dillard continued to kneel on an incapacitated arrestee supports an inference of 'acquiescence in the alleged use of force.'"  *Id.* (quoting *Hale*, 45 F.3d at 917, 919).  The court granted summary judgment to another officer because he was absent during the incident and therefore "lacked a reasonable opportunity to intervene," and denied summary judgment to a fourth officer, because "a jury could find that [he] remained present on the scene and acquiesced in the violation of Timpa's Fourth Amendment rights."  *Id.*

In each case that denied summary judgment on a bystander liability claim, the bystander defendants failed to act to prevent another officer's excessive use of force and clearly acquiesced

in that harm by "st[anding] by and laugh[ing]."  In each of these cases, the excessive force was ongoing for an extended period—in *Timpa*, for example, the excessive force went on for a staggering fourteen minutes—allowing ample opportunity for an officer to intervene.  Here, White seeks to hold Officer Brown liable for failing to intervene *before* Officer Calvert even used excessive force.  White alleges that Officer Brown "could have told Defendant Calvert[] not to release the dog after calling out 'Dog, Dog, Dog.'"  (Docket Entry No. 1, at 16).  The body camera footage shows the dog entering the shed six seconds after Brown called out "Dog, dog, dog," leaving only six seconds for Brown to reverse his request.  This case is more akin to *Deshotels*, which granted summary judgment on a bystander liability claim for officers who did not prevent another officer from using lethal taser force on a potentially armed suspect evading arrest. *Deshotels*, 454 F. App'x at 268.

There was no error as to the Fifth Circuit bystander liability cases address whether an officer may be liable under bystander liability for erroneously, or falsely, requesting the assistance of a dog, resulting in the dog handler's release of that dog.  The bystander officer was not the dog handler and had no knowledge of how to command or direct the dog's actions once released.  No case addresses whether merely requesting the release of a dog by itself can result in bystander liability when the officer testifies that he did not know that the request would necessarily result in one or more bites. None of the cases address whether an officer may be liable under a theory of bystander liability for failing to take actions to remove a biting canine from a suspect, even if the dog cannot respond to verbal commands from any officer other than its handler.

There does not need to be an exact case on point if "the confines of the officer's violation [are] beyond debate."  *Cope*, 3 F.4th at 205 (citation omitted).  The Fifth Circuit has, for example,

36

held that an officer's violation of the Constitution was beyond debate when an officer arrested and sought to prosecute the plaintiff for asking questions of public officials. *Villareal v. City of Laredo*, 17 F.4th 532, 540 (5th Cir. 2021).   The court noted that "this [was] not just an obvious constitutional infringement—it's hard to imagine a more textbook violation of the First Amendment." *Id.*

This case does not involve the type of "patently obvious" infringement of a constitutional right, such as the First Amendment protected right to ask questions of public officials without retaliation. *Id.*   White has not identified a case in the Fifth Circuit or other circuits that applies bystander liability in the manner White seeks: to hold Officer Brown for not just failing to intervene in another officer's use of force, but also for instigating Officer Calvert's use of force by shouting out "dog, dog, dog.  He's reaching.  Dog, dog, dog."  It is not "beyond debate" that Officer Brown's request for dog assistance—after White had evaded the police for over two hours in the middle of the night—violated White's constitutional rights.

Based on the record and White's burden of proof at this stage, Officer Brown is entitled to qualified immunity.

## IV.   Conclusion

The defendants' motion for summary judgment, (Docket Entry No. 17), is granted in part and denied in part.  The defendants' motion for summary judgment as to White's bystander liability claim against Officer Brown is granted, and White's bystander liability claim is dismissed with prejudice.  The defendants' motion for summary judgment as to White's excessive force claim against Officer Calvert is denied, but the court limits White's excessive force claim to force that

occurred after the dog released its initial bite on White's arm.  Docket call on the remaining claim is set for **January 14, 2022, at 2:00 P.M** by Zoom.  A video conference link will be sent separately.

SIGNED on December 27, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

## **APPENDIX**

